**E-FILED**
Monday, 09 July, 2007  03:19:27 PM
Clerk, U.S. District Court, ILCD

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | | |
|---|---|---|
| TONY SCOTT, #N92280, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| - vs- | ) | No. 06-3144 |
| | ) | |
| DR. LOWELL BROWN, OFFICER HENDRICKS, NURSE O'CONNER, DEBORAH K. FUQUA, TERRY L. POLK, ROGER A. ZIMMERMAN, and ROGER WALKER, | ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

NOW COME the defendants, KAROLYN HENDRICKS, DEBORAH K. FUQUA, TERRY POLK, ROGER E. WALKER, JR., and ROGER ZIMMERMAN, by and through their attorney, Lisa Madigan, Attorney General for the State of Illinois, to submit this memorandum of law in support of their motion for summary judgment, stating as follows:

### Introduction

Plaintiff, Tony Scott, was formerly incarcerated by the Illinois Department of Corrections at Western Correctional Center. Plaintiff filed this suit pursuant to 42 U.S.C. §1983 alleging deliberate indifference to his serious medical needs. Specifically, Plaintiff alleges that his treating physician denied him the proper medications for his coronary artery disease while these defendants turned a blind eye to the situation. Plaintiff also alleges that Defendant Hendricks failed to get him medical attention when he was having chest pains in his cell on August 10, 2005.

1

All of the defendants deny having any personal involvement in the regulation of Plaintiff's prescription medications and further deny that they were deliberately indifferent to his serious medical needs.  Defendants assert that summary judgment in their favor is warranted, as Plaintiff will be unable to prove, as a matter of law, that they were deliberately indifferent to his serious medical needs.

### Material Facts Claimed to be Undisputed

1.    Plaintiff Tony Scott arrived at Western Correctional Center in March of 2005. (Deposition of Tony Scott ("Plaintiff's Dep."), attached hereto as Exhibit A, at pp. 26-27).

2.    Plaintiff suffers from coronary artery disease.   (Plaintiff's Complaint, generally.)

3.    Plaintiff's coronary artery disease was treated by Dr. Lowell Brown at Western Illinois Correctional Center.  (Plaintiff's Dep. at p. 36).

4.    Plaintiff testified that his medical care at Western was satisfactory until June of 2005 when some of his prescriptions were discontinued and/or changed by Dr. Brown. (Plaintiff's Dep. at p. 38).

5.    Plaintiff testified that Dr. Brown discontinued his Plavix, Zocor, Isosorbide, and Nitro prescriptions in June of 2005.  (Plaintiff's Dep. at p. 38).

6.    Plaintiff testified that he was without a prescription for Nitro pills until July 20, 2005.  (Plaintiff's Dep. at p. 50).

7.    Plaintiff testified that he was without a prescription for Plavix, Zocor, and Isosorbide during the rest of his incarceration at Western until his transfer to Logan Correctional Center.  (Plaintiff's Dep. at pp. 62-63).

2

8.    Plaintiff alleges that Defendants Fuqua, Polk, Walker, and Zimmerman turned a blind eye to the fact that Plaintiff's prescriptions were discontinued.  (Plaintiff's Complaint, generally).

9.    Defendant Deborah Fuqua is the Health Care Unit Administrator ("HCUA") at Western Correctional Center.  (Plaintiff's Dep. at p. 98).

10.    Defendant Fuqua never treated Plaintiff, but did provide responses to his grievances about medical care.  (Plaintiff's Dep. at pp. 98-99).

11.    Plaintiff testified that he addressed his concerns about prescriptions to Defendant Fuqua's attention but that she just went along with what Dr. Brown was doing. (Plaintiff's Dep. at p. 100).

12.    As HCUA, Defendant Fuqua was responsible for managing and directing the daily operations of the Health Care Unit, coordinating and implementing policies and procedures, and carrying out other administrative duties.  Providing medical care and treatment to inmates and supervising the medical care being provided were not among her official duties.  (See CMS Position Description for HCUA, Response to Plaintiff's Interrogatories #1, attached hereto as Exhibit G).

13.    Defendant Polk was the Warden at Western Correctional Center from October 16, 2004 to December 15, 2005.  (Affidavit of Terry Polk ("Polk Affidavit"), attached hereto as Exhibit B).

14.    Plaintiff and his wife addressed their concerns about Plaintiff's prescriptions to Defendant Polk, who responded by advising Plaintiff to use the  grievance procedure. (Plaintiff's Dep. at p. 94; Polk Affidavit, Exhibit B).

15.     Defendant Zimmerman has been the Warden of Western Illinois Correctional Center since February 1, 2006.  (Affidavit of Roger Zimmerman ("Zimmerman Affidavit"), attached hereto as Exhibit C).

16.     Prior to becoming Warden, Defendant Zimmerman also served as Assistant Warden at Western Correctional Center during the time Plaintiff was incarcerated there. (Plaintiff's Dep. at p. 93).

17.     Plaintiff also addressed his concerns about his prescriptions to Defendant Zimmerman, who responded that he was not a doctor and told Plaintiff to go to the Health Care Unit.  (Plaintiff's Dep. at p. 96).

18.     Neither Defendant Polk nor Defendant Zimmerman are doctors.  (Plaintiff's Dep. at p. 97).

19.     Neither Defendant Polk nor Defendant Zimmerman are trained or qualified to provide medical treatment or prescribe medication.  (Polk Affidavit, Exhibit B; Zimmerman Affidavit, Exhibit C).

20.     Defendant Walker is the Director of the Department of Corrections. (Plaintiff's Dep. at p. 97).

21.     Plaintiff's only complaint about Defendant Walker is that he never responded to letters sent by Plaintiff and his wife regarding their concerns about Plaintiff's prescriptions.  (Plaintiff's Dep. at p. 97).

22.     Neither Plaintiff nor his wife have had any personal contact with Defendant Walker.  (Plaintiff's Dep. at p. 98).

23.    Defendant Hendricks was formerly employed as a Correctional Officer at Western Correctional Center.  (Affidavit of Karolyn Hendricks ("Hendricks Affidavit"), attached hereto as Exhibit D).

24.    Defendant Hendricks never treated Plaintiff.  (Hendricks Affidavit, Exhibit D).

25.    Plaintiff's only complaint with Defendant Hendricks is that she kept walking away from his cell and did not call for help after he informed her that he was having chest pains and did not have any Nitro pills on August 10, 2005.  Plaintiff testified that Defendant Hendricks was present on the wing because she was collecting trash.  (Plaintiff's Dep. at pp. 102-107).

26.    Plaintiff alleges that Defendant Hendricks stated that Plaintiff must not need Nitro pills if he didn't have any more.  (Plaintiff's Dep. at p. 103).

27.    Defendant Hendricks does not recall encountering Plaintiff or speaking to him about his Nitro pills on August 10, 2005.  (Hendricks Affidavit, Exhibit D).

28.    Defendant Hendricks would have contacted a Lieutenant, Captain, or staff at the Health Care Unit had she observed Plaintiff to be having a medical emergency or in need of medical attention.  (Hendricks Affidavit, Exhibit D).

29.    When an offender is having a medical emergency there is a button in his cell that he can push for assistance.  (Plaintiff's Dep. at p. 105).

30.    The officer on duty in the wing is supposed to respond when an offender pushes the emergency button.  (Plaintiff's Dep. at p. 107).

31.    Defendant Hendricks was not the officer on duty in Plaintiff's gallery on August 10, 2005.  (Plaintiff's Dep. at p. 107).

32.    Plaintiff testified that he suffered chest pain all through the night on August 10, 2005, but that it was mostly gone the next day.  (Plaintiff's Dep. at p. 109).

33.    Plaintiff was next seen in the Health Care Unit on August 22, 2005.  (Plaintiff's Dep. at p. 109).

34.    Plaintiff's medical records from August of 2005 indicate that Plaintiff suffered no harm or injury as a result of the chest pains he experienced on August 10, 2005.  (See Plaintiff's Medical Progress Notes for August, 2005, attached hereto as Exhibit E).

35.    Plaintiff testified that he experienced fatigue, numbness on his right side, chest pains, and tingling in his left finger tips during the period of time that his preferred medications were discontinued.  (Plaintiff's Dep. at p. 118).

36.    Plaintiff testified that his prescriptions for Plavix, Isosorbide, Zocor, and Nitro pills have been reinstated but that he still experiences fatigue, numbness on his right side, and chest pains on and off to this day.  (Plaintiff's Dep. at pp. 118-19).

37.    Administrative Review Boards records indicate that Plaintiff never properly exhausted his administrative remedies regarding the alleged staff conduct of Karolyn Hendricks on August 10, 2005 at Western Illinois Correctional Center.  (Affidavit of Melody Ford, attached hereto as Exhibit F).

### Argument

### I.    Summary judgment is appropriate in this case.

Federal Rule of Civil Procedure 56(c) directs the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  *Celotex*, 477 U.S. at 322.  "[T]he

6

preliminary question [is] not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it upon whom the onus of proof is imposed." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986). Where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue to try. *Mechnig v. Sears, Roebuck & Co.*, 864 F.2d 1359, 1365-67 (7th Cir. 1988).

In this case, there are no material facts in dispute about the medical care or prescription medications that Plaintiff received while he was incarcerated at Western Correctional Center. Plaintiff and these Defendants agree that four of Plaintiff's prescription medications were discontinued by Dr. Brown for a period of time. (Undisputed Facts #4-5). The issues contested in this case are issues of law regarding whether these Defendants' actions constituted deliberate indifference to Plaintiff's serious medical needs. These Defendants are entitled to summary judgment in their favor, as Plaintiff will be unable to prove, as a matter of law, that they were deliberately indifferent to his serious medical needs.

**II.     As a matter of law, Plaintiff cannot prevail against these Defendants on a claim for deliberate indifference based on a disagreement with his physician about the proper prescriptions for his heart condition.**

In *Estelle v. Gamble*, the Supreme Court held that in order to violate a prisoner's Eighth Amendment rights as they relate to medical care, an official must demonstrate deliberate indifference to the serious medical needs of that inmate, and concluded that "deliberate indifference to serious medical needs of prisoners" constitutes the "unnecessary and wanton infliction of pain." 429 U.S. 97, 104 (1976). However, the Court drew a distinction between an "inadvertent failure to provide adequate medical care," *Id.* 105, and

7

"an unnecessary and wanton infliction of pain" that is "repugnant to the conscience of mankind." *Id.* at 106.

"To raise an Eighth Amendment issue, 'the infliction [of punishment] must be deliberate or otherwise reckless in the criminal law sense, which means that the defendant must have committed an act so dangerous that his knowledge of the risk can be inferred or that the defendant actually knew of an impending harm easily preventable.'" *Snipes v. Detella*, 95 F.3d 586, 590, *citing Antonelli v. Sheahan*, 81 F.3d 1422, 1427 (7th Cir. 1995). Furthermore, "mere negligence or even gross negligence does not constitute deliberate indifference." *Id.*, *citing Wilson v. Seiter*, 501 U.S. 294, 305 (1991). Likewise, "medical decisions that may be characterized as 'classic example[s] of matter[s] for medical judgment *such as whether one course of treatment is preferable to another'* are beyond the Amendment's purview." *Snipes v. Detella*, 95 F.3d 586, 591 (7th Cir. 1996)(emphasis added).

While the state has "an affirmative obligation under the Eighth Amendment to provide persons in its custody with a medical care system that meets minimal standards of adequacy," *Meriwether v. Faulkner*, 821 F.2d 408, 4ll (7th Cir. 1987), inmates are not entitled to unqualified access to health care. *Hudson v. McMillian*, 503 U.S. 1 (1992); *see also Wilson v. Seiter*, 501 U.S. 294 (1991). "A prisoner's dissatisfaction with a doctor's prescribed course of treatment does not give rise to a constitutional claim unless the medical treatment is so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate the prisoner's condition." *Snipes*, 95 F.3d at 592.

In this case, Plaintiff alleges that his serious medical need was coronary artery disease. (Undisputed Fact #2). Plaintiff's allegations of deliberate indifference are based

8

on the fact that Dr. Brown discontinued his Plavix, Zocor, Isosorbide, and Nitro prescriptions for a period of time while he was at Western Correctional Center. (Undisputed Facts #4-7). Plaintiff alleges that Defendants Fuqua, Polk, Zimmerman, and Walker turned a blind eye to the situation. (Undisputed Fact #8). However, even if true, this conduct would not rise to the level of a constitutional violation. Plaintiff is simply dissatisfied with the course of treatment that was prescribed by his doctor. The only additional symptom Plaintiff claims to have had during the period of time that he was off his preferred medications is tingling in his left fingers. (Undisputed Facts #35-36). There is no evidence that the medical treatment prescribed was so blatantly inappropriate as to evidence intentional mistreatment likely to aggravate his condition or that it was so inappropriate that a layperson would have known.

Moreover, these defendants are non-medical prison officials. (Undisputed Facts #9-10, 12-13, 15-20). Non-medical prison officials are not generally chargeable with deliberate indifference because they must rely on those with medical expertise to assess the needs of inmates and to prescribe treatment. *See Johnson v. Doughty*, 433 F.3d 1001, 1011 n.9 (2006). These Defendants are not trained, qualified, or authorized to prescribe Plaintiff medication or to change his prescriptions. (Undisputed Facts #9-10, 12-13, 15-20). Plaintiff was being treated by a physician, Dr. Brown. (Undisputed Fact #3). Accordingly, these Defendants had to rely on Dr. Brown to choose and prescribe the correct medications.

**III.     These Defendants lack the requisite personal involvement for liability under 42 U.S.C. §1983.**

Liability under §1983 requires a plaintiff to show direct, personal responsibility on the defendants' part for those acts and omissions claimed to have deprived the plaintiff of his

rights. *Crowder v. Lash*, 687 F.2d 996, 1005 (7th Cir. 1982). Supervisory officials will not be found liable under the doctrine of respondeat superior. *Duckworth v. Franzen*, 780 F.2d 645, 650 (7th Cir. 1985). In order to be held liable under §1983, a supervisor must have "had some personal involvement in the constitutional deprivation, essentially directing or consenting to the challenged conduct." *J.H. and J.D. v. Johnson*, 346 F.3d 788, 793 (7th Cir. 2003). A supervisor who is merely negligent in failing to detect and prevent other employees' conduct will not be liable under §1983. *Jones v. Chicago*, 856 F.2d 985, 992 (7th Cir. 1988). Personal involvement cannot be established simply by alleging that a defendant was notified by letter of an alleged Constitutional violation. *Volk v. Coler*, 638 F.Supp. 1540, 1548, *aff'd* 845 F.2d 1422 (7th Cir. 1988).

None of these Defendants had direct, personal responsibility for the regulation of Plaintiff's prescription medications. (Undisputed Facts #9-12, 17-25). To the extent that Plaintiff claims any of these Defendants were Dr. Brown's supervisor, they cannot be found liable for failing to detect any negligence or wrongdoing on his part. These Defendants lack the requisite personal involvement for liability under §1983 to the extent that Plaintiff bases his deliberate indifference claims on changes to his prescription medications.

## IV. As a matter of law, Defendant Hendricks was not deliberately indifferent to Plaintiff's serious medical needs on August 10, 2005.

Plaintiff alleges that he suffered chest pains in his cell on August 10, 2005, and that he did not have any Nitro pills. (Undisputed Fact #25). Plaintiff testified that Defendant Hendricks was present on the wing because she was collecting trash. (Undisputed Fact #25). Plaintiff alleges that he informed Defendant Hendricks that he was having chest pains and that he did not have any Nitro pills but Defendant Hendricks just kept walking and did

not call a Lieutenant or Sergeant. (Undisputed Fact #25). Plaintiff alleges that Defendant Hendricks responded that Plaintiff must not need the Nitro pills if he didn't have any more. (Undisputed Fact #26). Defendant Hendricks does not recall the encounter alleged by Plaintiff. (Undisputed Fact #27). However, if Defendant Hendricks had observed Plaintiff to be having a medical emergency, she would have contacted her superiors or the medical staff for help. (Undisputed Fact #28).

Defendant Hendricks' conduct as alleged by Plaintiff, even if it were true, does not rise to the level of a constitutional violation. Plaintiff alleges that he told Defendant Hendricks that he did not have any more Nitro pills and that she responded that he must not need them. Allegations of vulgar or derogatory remarks are not sufficient to state a claim under 42 U.S.C. §1983. *Dewalt v. Carter*, 224 F.3d 607, 612 (7th Cir. 1999); *Patton v. Przybylski*, 822 F.2d 697, 700 (7th Cir. 1987). Defendant Hendrick's alleged remarks did not violate Plaintiff's rights.

Nor were Plaintiff's constitutional rights violated if Plaintiff asked her to call a Lieutenant or Sergeant and she failed to do so. Plaintiff's cell had an emergency button within it that he could push to summon assistance. (Undisputed Fact #29). The officer on duty in the wing is supposed to respond when an offender pushes the emergency button. (Undisputed Fact #30). Defendant Hendricks was not the officer on duty on August 10, 2005. (Undisputed Fact #31). Thus, Plaintiff had other means of summoning assistance if he was having chest pains.

Furthermore, Plaintiff has no evidence to support the subjective element of a deliberate indifference claim; that Defendant Hendricks knew he had a serious medical need and recklessly or purposefully ignored it. Plaintiff's allegations about Defendant

11

Hendricks' conduct would support a claim that she inadvertently failed to provide adequate medical care, however they do not support a claim of a reckless or knowing risk to a serious medical need. Defendant Hendricks' conduct as alleged does not amount to an act so dangerous that her knowledge of the risk can be inferred or that she actually knew of an impending harm easily preventable.

Moreover, Plaintiff's chest pains do not actually qualify as a sufficiently serious medical need. *See Henderson v. Sheahan*, 196 F.3d 839, 846 (7th Cir. 1999) (breathing problems, chest pains, dizziness, sinus problems, and headaches are "not sufficiently serious to be constitutionally actionable"). Such ailments are, "objectively speaking, relatively minor." *Id*. Although Plaintiff's alleged chest pains may have caused him distress or discomfort, they are not the sort of objectively serious medical need that amount to a denial of "the minimal civilized measure of life's necessities." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). Plaintiff testified that he suffered chest pains throughout the night of August 10, 2005, but that they were mostly gone in the morning. (Undisputed Fact #32). Plaintiff was next seen in the Health Care Unit on August 22, 2005. (Undisputed Fact #33). According to the medical progress note of that visit, it does not appear that Plaintiff suffered any harm or an injury from the chest pains he experienced on August 10, 2005. (Undisputed Fact #34). Plaintiff's chest pains, as alleged, were not sufficiently serious to be constitutionally actionable. As a matter of law, Defendant Hendricks was not deliberately indifferent to Plaintiff's serious medical needs.

**V.      Plaintiff failed to exhaust his administrative remedies with respect to his deliberate indifference claim against Defendant Hendricks.**

Pursuant to the Prison Litigation Reform Act, all inmates bringing an action under 42 U.S.C. §1983, with respect to prison conditions, must first exhaust all administrative remedies available to them before being allowed to proceed with the lawsuit.  42 U.S.C. §1997e(a) (2007).  Section 1997e(a) specifically provides:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison or other correctional facility until such administrative remedies as are available are exhausted.

The exhaustion statute is "too clear" and suits "must be dismissed" if administrative remedies are not followed.  *Perez v. Wisconsin Dept. of Corrections*, 182 F.3d 533, 534 (7th Cir. 1999).  That exhaustion of administrative remedies would be futile is no exception or excuse to the requirement.  *Id.* at 537.  Plaintiff's suit must be dismissed if administrative remedies are not fully and properly exhausted.  *Woodford v. Ngo*, 126 S.Ct. 2378, 2383 (2006) (holding that prisoner cannot satisfy exhaustion requirement by filing untimely or otherwise procedurally defective grievances).

In order to fully and properly exhaust administrative remedies, DOC inmates are required to file a grievance regarding an issue at the institutional level; receive a response from the Chief Administrative Officer of the institution (Warden) and, if the Warden denies the grievance, appeal the denial to Director through the Administrative Review Board (ARB). 20 Ill. Admin. Code 504.850 (West 2007).  Therefore, unless a decision has been rendered by the Administrative Review Board, an inmate has not fully exhausted his administrative remedies.

In the instant case, Plaintiff failed to properly file and appeal a grievance in accordance with Illinois Department of Corrections regulations about the alleged staff conduct of Defendant Hendricks on August 10, 2005. (Undisputed Fact #37). Even if Plaintiff subsequently exhausted his administrative remedies on these claims, Defendant Hendricks is still entitled to summary judgment, because exhaustion must be completed *before* the suit is filed. *See Perez*, 182 F.3d at 534 (stating that a district court lacks discretion to resolve a claim on the merits where administrative remedies are exhausted after the suit is initiated but before judgment). Plaintiff failed to exhaust his administrative remedies with respect to his claim against Defendant Hendricks and it should be dismissed.

## VI.    Defendants are entitled to qualified immunity.

Government officials performing discretionary functions are generally shielded from liability for civil damages if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 102 S.Ct. 2727, 2738, 457 U.S. 817, 818 (1982). To determine whether an official is entitled to qualified immunity, a two part inquiry is required: (1) whether a constitutional right would have been violated on the facts alleged, and (2) whether the right alleged to have been violated was clearly established. *Saucier v. Katz*, 533 U.S. 194, 200 (2001). The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable official that his conduct was unlawful in the situation he confronted. *Id.* at 202. An official who makes a reasonable mistake as to what the law requires is entitled to the defense of qualified immunity. *Id.* at 205.

Defendants Polk, Fuqua, Walker, and Zimmerman are not physicians and were not trained, qualified, or licensed to prescribe Plaintiff medication. (Undisputed Facts #10, 18-20, 22-24). Given the current state of the law, it would not be clear to reasonable officials

14

in their position that it would be unconstitutional to rely on Plaintiff's doctor to prescribe the proper medication for his coronary artery disease. Furthermore, the law is clear that an inmate's disagreement with the course of treatment prescribed by a doctor does not create a valid cause of action under the Eighth Amendment. Similarly, the law in this Circuit has made clear that allegations of chest pains, alone, are not sufficiently serious to be actionable under the Eighth Amendment. Thus, it would not have been clear to a reasonable official in Defendant Hendricks' position that the actions allegedly taken were unconstitutional. These defendants are entitled to qualified immunity under the facts alleged in this case.

WHEREFORE, for the foregoing reasons, Defendants respectfully request this honorable Court to enter summary judgment in their favor and against Plaintiff.

Respectfully submitted,

KAROLYN HENDRICKS, DEBORAH K. FUQUA, TERRY POLK, ROGER E. WALKER, JR., and ROGER ZIMMERMAN,

Defendants,

LISA MADIGAN, Attorney General, State of Illinois

By:   s/ Lindsay Sweet
Lindsay Sweet, #6287510
Assistant Attorney General
Attorney for Defendants
500 South Second Street
Springfield, Illinois  62706
Telephone:  (217) 782-9026
Facsimile:   (217) 524-5091
E-Mail:  lsweet@atg.state.il.us

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | | |
|---|---|---|
| TONY SCOTT, #N92280, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| - vs- | ) | No. 06-3144 |
| | ) | |
| DR. LOWELL BROWN, OFFICER | ) | |
| HENDRICKS, NURSE O'CONNER, | ) | |
| DEBORAH K. FUQUA, TERRY L. POLK, | ) | |
| ROGER A. ZIMMERMAN, and ROGER | ) | |
| WALKER, | ) | |
| | ) | |
| Defendants. | ) | |

## CERTIFICATE OF SERVICE

I hereby certify that on July 9, 2007, I electronically filed a Memorandum of Law in Support of Defendants' Motion for Summary Judgment with the Clerk of the Court using the CM/ECF system which will send notification of such filing(s) to the following:

Robert P. Vogt                         Theresa M. Powell
bvogt@wlv-online.com                   tpowell@hrva.com

Rhett B. Strom                         April Gowdy Troemper
rstrom@vlv-online.com                  atroemper@hrva.com

and I hereby certify that on July 9, 2007, I mailed by United States Postal Service, the document(s) to the following non-registered participant(s):

Tony Scott
946 N. Kedvale
Chicago, Illinois  60651

Respectfully Submitted,
 s/ Lindsay Sweet
Lindsay Sweet, #6287510
Assistant Attorney General
Attorney for the Defendants
500 South Second Street
Springfield, Illinois  62706
Telephone:  (217) 782-9026
Facsimile:   (217) 524-5091
E-Mail:  lsweet@atg.state.il.us

E-FILED
Monday, 09 July, 2007 03:19:58 PM
Clerk, U.S. District Court, ILCD

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF ILLINOIS

SPRINGFIELD DIVISION

COPY

TONY SCOTT,

      Plaintiff,

    vs.                    No. 06-3144

DR. LOWELL BROWN, et al,

      Defendants.

      THE DEPOSITION of TONY SCOTT, taken in the above-entitled case before Tricia L. Gudgel, a Notary Public of Menard County, acting within and for the County of Logan, State of Illinois, at 10:50 o'clock A.M., on April 11, 2007, at Logan Correctional Center, Lincoln, Logan County, Illinois, pursuant to notice.

Baldwin Reporting & Legal-Visual Services

Serving Illinois, Indiana & Missouri

24hrs (217)788-2835   Fax (217)788-2838

1-800-248-2835

1

EXHIBIT

A

```
 1     guess?

 2         A     Right.  Right.

 3         Q     So how long were you on house arrest then

 4     prior to your trial?

 5         A     I'm estimating right now, you know what

 6     I'm saying --

 7         Q     Sure, whatever you can do.

 8         A     (Continuing)--because it's not exactly.

 9     I'll say about six months.

10         Q     You came into the Department of

11     Corrections after your trial at Cook County; is

12     that right?

13         A     Yes.

14         Q     Did you first go to Joliet for

15     processing?

16         A     Yes.

17         Q     And then from Joliet you came down to?

18         A     Mt. Sterling.

19         Q     Pardon me?

20         A     Mt. Sterling.

21         Q     Is it the same as Western?

22         A     Same place.

23         Q     And you got to Mt. Sterling in March of

24     '05, 2005?
```
                                                            26

```
 1          A     Somewhere around in there.

 2          Q     Is that right?

 3          A     Yes.

 4          Q     I think I was going through your

 5     Complaint --

 6          A     Yes, in March of '05.

 7          Q     "I arrived at Western Correctional Center

 8     at the beginning of March 2005."

 9          A     Yeah.  Something like that, yeah.

10          Q     Now, let me just keep going on a couple

11     more questions.  Now, before coming to the

12     Department of Corrections, do you remember the name

13     of any doctor that you were seeing for your heart

14     condition?  I know you mentioned going to Cook

15     County but do you remember the name of the doctor?

16          A     At Mt. Sterling?

17          Q     No, at Cook County?

18          A     Dr. Castro -- I can't think of his name.

19          Q     El Khadra?

20          A     Yeah, him.

21          Q     The doctor El, it's:  E-L, space,

22     K-H-A-D-R-A.

23          A     I saw him one -- but I'm quite sure it's

24     the same thing.
```
                                                    27

1       A    Yes.

2       Q    So you had that with you when you --

3       A    Yes.

4       Q    (Continuing)--came to Western?

5       A    Yes.  And --

6       Q    Hang on, I'll turn the page here.

7       A    And that one.

8       Q    And this is the other document, this is

9    dated February 2, 2005 from a Dr. Ting:  T-I-N-G;

10   is that correct?

11      A    Correct.

12      Q    And you had this with you too?

13      A    Correct.

14      Q    And you went to see -- you first saw

15   Dr. Brown, let's see, in June; is that right?

16      A    Correct.

17      Q    And that was June of 2005, right?

18      A    Correct.

19      Q    Between March of 2005 and June of 2005,

20   do you have any complaints or issues with the care

21   and treatment that you were being provided at the

22   Western Correctional Center, or was it okay?

23      A    Pardon me, would you say that again?

24      Q    Sure.  You arrived at Western in March of

                                                36

1    focus our attention on the areas that you have

2    complaints about, okay. And as I understand your

3    testimony, from March when you arrived at Western

4    until you saw Dr. Brown, the medical care that was

5    provided to you was okay; is that all right?

6         A    Yeah, when -- at first, yes.

7         Q    Until June?

8         A    When I first got there, yes.

9         Q    In June what medication do you believe

10   Dr. Brown stopped?

11        A    He stopped my Plavix, my Zocor,

12   Isosorbide, and that's what he stopped first.

13        Q    Those three?

14        A    Yeah, and the nitro pills. And then he

15   came back and stopped the nitro pills.

16        Q    So now how long were the -- do you

17   believe the Plavix was stopped?

18        A    He stopped all of them around the same --

19   I could tell you, one second. My recollection it

20   stopped around --

21        Q    Can I help you, maybe? Can I show you?

22        A    Basically around 6-16 of '05.

23        Q    Can I show you, sir? Maybe I can direct

24   your attention and you can tell me if this is the

                                                      38

1    then you were fine?

2        A    No, because see -- if I'm not mistaken,

3    the doctor, she wrote down, which I think is also

4    in the Complaint, that shows that I was --

5        Q    Which doctor?

6        A    (Continuing)--supposed to be put back on

7    all my cardiac medication, on all my heart

8    medication. And I showed that to Dr. Brown and

9    Deborah Fuqua, they refused to put me back on the

10   right medication.

11       Q    Let's take one thing at a time.  I'm

12   again referring to the medication administration

13   record, okay.  And my question is:  On July 20, 25

14   tablets of nitroglycerine were administered to you,

15   right?

16       A    Uh-huh.

17       Q    Is that true, is that a yes?

18       A    Yes.  Yes, I'm sorry.

19       Q    So you were back on your nitroglycerine?

20       A    Correct.

21       Q    Any other medications that you were not

22   provided with?

23       A    I was not provided with Plavix, Zocor or

24   Isosorbide.

                                                    50

1      Q    The knife goes up, it's about to come

2    down and you don't want it to.  That's fine, I

3    won't argue about it.

4            Do you know why, sir -- you just tell me

5    this, do you know why the Isosorbide and the Zocor

6    and the Plavix, why they were not restarted with

7    you at Western?  Do you know what the medical

8    theory was?

9      A    Because when I got here and I showed

10   these doctors over here the same papers from Cermak

11   Health Center and from Cook County Hospital about

12   my heart, and I told them -- I let them know I had

13   three heart attacks and a stroke.

14            And he looked and said -- and I told them

15   that Dr. Brown down at Mt. Sterling discontinued my

16   Plavix, Zocor, and my Isosorbide.  And the doctor

17   say why did he do that.  And I'm like I don't know,

18   I hadn't the slightest idea.  He said you need them

19   and he restarted me back on them.

20     Q    So the doctor here at Logan believes and

21   felt that you needed the Isosorbide, Zocor and

22   Plavix?

23     A    Plavix, correct.

24     Q    So he restarted them?

62

1       A     Correct.

2       Q     Dr. Brown felt that you did not need

3    them?

4       A     Correct.

5       Q     Do you know what the -- and your

6    testimony is the cardiologist at the hospital,

7    whatever he told Dr. Brown we'll leave that for the

8    records, right?

9       A     I believe that's what he say --

10      Q     Good enough, okay.

11             Well let me ask you this:  Tell me, when

12   you don't take the Zocor, okay, certainly you don't

13   feel differently, do you?

14      A     I mean, not if you miss one pill.  But as

15   you go on, like just say for instance, when I was

16   down in Mt. Sterling and I didn't have all my

17   medication, do you know what I'm saying.

18      Q     Hang on.  I'm asking you a very specific

19   question.

20      A     But you asked me a specific question

21   about one pill.

22      Q     One pill, that's right.

23      A     But see, I can't answer that because all

24   of them work together.  It's like A, B, C and D.

                                                    63

1        Q    And then while you were at Western, he

2    moved somewhere else and another Warden came in; is

3    that right?

4        A    Yes.

5        Q    Was that Warden Zimmerman?

6        A    Correct.

7        Q    So they were both wardens at Western but

8    not at the same time?

9        A    No, Zimmerman was assistant warden while

10    Polk was there.

11        Q    And after Polk left, did Zimmerman remain

12    on?

13        A    Yeah, Zimmerman became head warden.

14        Q    Then he became the head warden?

15        A    Correct.

16        Q    What is it that Warden Polk did that

17    you're complaining about?

18        A    Well, really I have wrote to Warden Polk

19    and informed him about what Deborah Fuqua allowed

20    Dr. Brown to do.  And I informed Warden Polk that I

21    had a heart problem and that, you know, that I was

22    not receiving the proper medication.

23        Q    Is that in grievances or letters or both?

24        A    It was in both grievance and letters, and

                                                93

1   my wife Marilyn Johnson, she had wrote to

2   Warden Polk as well.

3       Q    Did Warden Polk ever respond to any of

4   the letters?

5       A    I think he responded to her.  If I'm not

6   mistaken, I think I got it right here.  If I don't

7   got it here, it's in my cell.  These are the ones.

8   Right here.

9            It says, "I have received a letter from

10  Marilyn Johnson stating that you are eluding to her

11  that you are not receiving proper medications --

12  medical treatment at this facility."  And that's,

13  you know, "If you feel this is true, I recommend

14  that you follow the department grievance proceeding

15  by filing a grievance, if you have not already

16  started this proceeding."

17      Q    And that's a memo to you from

18  Warden Polk, right?

19      A    Correct.

20      Q    And he was telling you to use the

21  grievance procedure?

22      A    Yeah.  See, because Marilyn Johnson had

23  wrote to him about my heart and he let me know that

24  he received a letter from her.  And we telling him

                                                    94

1    did too. They signed off on all of my grievances.

2    And I'm sitting there letting them know that I have

3    a heart problem on every grievance that I done

4    sent. They signed off. That's Polk, you know what

5    I'm saying, 11-5. On all the grievances. That's

6    Zimmerman. So it's like -- and that's Polk.

7·    Q    Did you ever send letters to

8    Warden Zimmerman that he responded to other than

9    the grievances?

10    A    My wife did too. They did the same

11    thing. He did the same thing.

12    Q    And he would give you the same response,

13    use the grievance --

14    A    Yeah, turned a blind eye to my serious

15    medical need.

16    Q    Did he tell you to file grievances also?

17    A    Yes, he did. No. He didn't tell me to

18    file grievances, he just told me to go to the

19    health care, you know what I'm saying.

20    Q.    Sure.

21    A    And I told him I'd go over there but I'm

22    not receiving the proper medical care that I need

23    for my heart, you know what I'm saying. And he's

24    like, what you want me to do, I'm not a doctor.

96

1    That's how he responded to me verbally, you see

2    what I'm saying.

3        Q    Which is true as to both wardens.  To

4    your knowledge they're not doctors, are they?

5        A    But they're over the health care.  If

6    they over that whole institution, they in charge,

7    so they should make sure Fuqua is providing the

8    proper medical treatment to the residents that's in

9    that facility.

10       Q    I see.  But we an agree that --

11       A    No.

12       Q    (Continuing)--to your knowledge they are

13   not doctors, right?

14       A    They are not doctors but I'm quite sure

15   that he knows about heart problems.  He knows that

16   ain't no minor illness, you know.

17       Q    Let's talk about Roger E. Walker.  You've

18   sent letters to your wife --

19       A    I sent, she sent, you know what I'm

20   saying.  He really -- the only thing with him, with

21   Roger Walker is that he just failed to respond.  To

22   turn a blind eye to the situation of what the

23   warden and Fuqua is doing.  He's in charge of

24   everything, he's the director.

97

1        Q    So neither you nor your wife ever had any

2    personal contact with him; is that right?

3        A    Not with Walker.

4        Q    But as to the wardens, did you say in

5    your Complaint that you did speak to them about

6    your problems?

7        A    Yeah, I speak to both of them

8    face-to-face.

9        Q    And their verbal responses would be the

10   same as the written ones we talk about?

11       A    Basically.

12       Q    They'd tell you to file a grievance or go

13   to the health care unit?

14       A    Yeah.  Zimmerman, you know what I'm

15   saying, he kind of like, you know, answered a

16   couple questions sarcastically, you know what I'm

17   saying, so.

18       Q    Deborah Fuqua, what's your understanding

19   of her position?

20       A    She is the health care administrator,

21   she's in charge of the health care.

22       Q    And what's been your contact with her,

23   has she ever treated you medically?

24       A    No.  She -- every time I write a

                                                    98

1    grievance about, you know, medical treatment, you

2    know what I'm saying.  Sometimes I don't hear from

3    them but I get a response -- unless I put in a

4    request and let her know, look, I need to see you,

5    I need to speak with you, I'm not getting the

6    proper medication that I need.  Dr. Brown

7    discontinued my Plavix, Zocor, Isosorbide.

8        Q    When you wrote those grievances, would

9    the grievance officer contact her, Fuqua, for her

10   response?

11       A    You know, to be honest, I'm assuming they

12   would, they did, because her name and signature is

13   on there, you know, so I'm assuming they did get

14   back with her.

15       Q    And you also spoke to her in person about

16   your concerns; is that right?

17       A    So the grievance -- I wrote a grievance

18   on her too, like on Sue Bradshaw (sp).

19       Q    Sure but she is not a defendant in here?

20       A    No, but she's -- yeah, and they got one

21   with Ms. Fuqua.  Ms. Fuqua, the health care

22   administrator, you know what I'm saying.

23       Q    So the grievance officer would talk to

24   Fuqua?

                                                99

1          A    To Fuqua.  And some of my grievances come

2     up missing, as well.

3          Q    Is it your understanding that the

4     grievance officers response would be based on what

5     Fuqua would tell them?

6          A    I'm assuming so, you know what I'm

7     saying.

8          Q    So have you also complained to her in

9     person, besides the grievances?  Did you ever talk

10    to her about your problems?

11         A    To Fuqua?

12         Q    Yes.

13         A    Yes, I did.

14         Q    And what was her response?

15         A    I don't know right offhand, you know,

16    word-for-word kind of thing, you know what I'm

17    saying.  But she -- it's like she's very much --

18    has kind of going along with what Dr. Brown is

19    doing, you know what I'm saying.  When I know I

20    feel in my heart that she knows that that's wrong.

21         Q    If Dr. Brown's the doctor treating you

22    and she's this administration person, shouldn't she

23    go along with what the doctor thinks?

24         A    But if she knows there's something wrong,

                                                    100

1    you know, in order for her to have the spot where

2    she is, she had to have some type of specialty in

3    her field. You know, she got to have some type of

4    medical training in order to be in charge of the

5    health care, so she should have knew this.

6         Q    What is your understanding of the health

7    care training that she has?

8         A    In order for her to be a health care

9    administrator, she has to know about medical

10   issues, that's number one.

11        Q    Do you know specifically about her

12   training?

13        A    Not hand on hand, you know what I'm

14   saying, because I'm no medical administrator.

15        Q    Is it your understanding, yes or no, that

16   she could give you prescriptions or prescribe you

17   medications; could she do that?

18        A    I don't know. I don't know. Not to my

19   knowledge, I don't know. That's a question that I

20   can't answer.

21        Q    How about this Officer Hendricks, you had

22   some kind of a bad encounter with her?

23        A    Yes. We was on lock down and I didn't

24   have no more nitro pills, and I told

102

1       Officer Hendricks -- I said, excuse me

2       Officer Hendricks can I -- I don't have any more

3       nitro pills, can you get me a captain or a

4       lieutenant.

5              And I said I'm having chest pains and I

6       have heart problems.  And she said, the reason why

7       you don't have no more nitro pills is because you

8       don't need them.

9              And I says, excuse me and I asked her --

10      I said, what's your name.  And I said, what's your

11      name and she kept walking.  And I found out later

12      on through other people -- and my next door

13      neighbor, he's like, man, that's wrong, her name is

14      Hendricks.

15      Q     So she was kind of rude?

16      A     Yeah.

17      Q     Was this on August 10 of '05?

18      A     Oh, let me see -- and I had signed

19      affidavits from other inmates.

20      Q     Who heard the encounter or saw it?

21      A     Yes.  Yes, with Officer Hendricks.

22      Q     Does it say what date that was on?

23      A     It's the 10th, 8-10 of '05.  But I got

24      about seven affidavits, signed affidavits from

                                                    103

| 1 | different inmates stating that they saw, you know, |
|---|---|
| 2 | and heard what Officer Hendricks said. |
| 3 | Q    That they witnessed this encounter? |
| 4 | A    That they witnessed it, you know what I'm |
| 5 | saying. |
| 6 | Q    And we were talking earlier how you were |
| 7 | issued nitro pills on July 20 of 2005.  Now, I |
| 8 | guess they'd run out by August 10, you've taken |
| 9 | them all? |
| 10 | A    You said July 20? |
| 11 | Q    Well, in either event you didn't have any |
| 12 | on August 10?  Do you recall how long you hadn't |
| 13 | had them?  How long they had been gone? |
| 14 | A    From that time -- |
| 15 | MR. VOGT:  On August 10 was that?  I'm sorry. |
| 16 | THE DEPONENT:  This is the grievance on August |
| 17 | 10, that I wrote it.  I don't know exactly.  I |
| 18 | can't remember. |
| 19 | MS. SWEET:  Q  You don't remember? |
| 20 | A    No, I don't recall.  I don't recall.  But |
| 21 | I knew I was having chest pains when I told her |
| 22 | that and I didn't have no more nitro pills, you |
| 23 | know, that I do remember. |
| 24 | Q    You don't remember how long you'd been |

104

1    out of them. Do you remember if you had asked

2    anybody for any more?

3        A    Hendricks, I was telling her that I

4    didn't have no more nitro pills and I need some

5    medical attention.

6        Q    And you asked her to call a lieutenant or

7    a captain?

8        A    The lieutenant or the captain.

9        Q    She didn't do that?

10       A    No, she kept walking.

11       Q    Is there anything -- when you're in your

12   cell and you're having a medical emergency, what is

13   it that you're supposed to do?

14       A    I press the button. See, when you're

15   down, you press the button. And even when I was

16   pressing the button nobody came, I wrote a

17   grievance on that.

18       Q    Who usually comes when you press the

19   button? Who's suppose to come?

20       A    The officer.

21       Q    Like Officer Hendricks?

22       A    Well Officer Hendricks -- well, we was on

23   lock down and she was picking up trash because they

24   had passed out chow and stuff. And they come back
                                                      105

1    around, the officers had come back around and

2    collect the trash. And shortly when she got to my

3    cell, you know, I was experiencing chest pains and

4    I was telling her that I did not have anymore nitro

5    pills.

6        Q    Did she come to your cell because you

7    were pushing that button?

8        A    No, she was already on the deck.

9        Q    She was just going along collecting

10   trash?

11       A    Correcting trash.

12       Q    And you spoke with her?

13       A    No, I called to her from my -- my

14   cellmate called her. It's like -- see, my

15   cellmate, it's like this, you see what I'm saying.

16   You got cells down this way and then you got them

17   down this way, and right here is the front door and

18   then you got the button.

19            And all along the sides, and she was like

20   -- I'm on this side, I think I'm on -- I was like

21   60, 64, so I'm over here and she was like over

22   there but you can look out the door and see it.

23   She was collecting trash.

24            And I was having chest pains and I told

                                                    106

1      my cellmate I was having chest pains call the

2      police. And he said the officer is on the deck

3      now, they are picking up trash, you know.

4           Q     So you continued pushing that button?

5           A     No. I didn't push the button because the

6      police was already on the deck. I pushed the

7      button afterwards.

8           Q     Afterwards. Okay.

9                 And did anybody respond to you pushing

10     the button?

11          A     No. No.

12          Q     Who is it that's supposed to respond?

13          A     The officer, the officer on duty.

14          Q     The officer on duty in the gallery, in

15     your unit?

16          A     That got that wing.

17          Q     Who was that at that time?

18          A     I don't recall who that was at that time.

19          Q     Was it Officer Hendricks?

20          A     No, she didn't have -- you know, when --

21     when we be on lock down, you have, like, about four

22     our five officers, a lieutenant and a sergeant that

23     come around because they can't open the door unless

24     a lieutenant or sergeant is on the wing.

                                                        107

```
 1        A    A little bit, yes.

 2        Q    (Continuing)--a little bit better,

 3   somewhat back to normal?

 4        A    Yes.

 5        Q    Now, then when did you next go to health

 6   care unit?

 7        A    Well I went --

 8        Q    You didn't go that night or the next

 9   day; is that correct?

10        A    No.  No, because we were still in lock

11   down.

12        Q    I think I saw in your medical records

13   that you were next seen in sick call on August 22;

14   does that seem right, about right?

15        A    Yeah, that's because we was on lock down,

16   I think for like two weeks, you know.  I don't

17   know.

18        Q    Now, I did see the grievance you wrote

19   about the incident with Officer Hendricks. Did you

20   record that anywhere else besides the grievance?

21   Did you ever tell anybody else about it verbally?

22        A    I told my wife, you know, a couple

23   inmates who witnessed it.

24        Q    Sure.
                                                    109
```

1    things, this is what I'm saying, so.

2        Q    The Complaint alleges that on June 16 and

3    17, Dr. Brown discontinued Plavix, nitroglycerine,

4    Zocor and Isosorbide, correct?

5        A    Correct.

6        Q    All right.  And you are telling us how

7    you felt after your -- the Isosorbide, Zocor and

8    Plavix were not restarted after your hospital

9    visit.  Tell us how you were feeling in June of '05

10   after they discontinued?

11       A    Well, let me see.  After the medicine was

12   discontinued, you know, shortly, it wasn't right

13   after, it was, you know, a period of time because I

14   was taking them up until we discontinued, so I'm

15   assuming there was some of it still in the system.

16           But after a while I was fatigued, tired

17   all the time, I was having numbness on my right

18   side, tingling in my fingertips, my left

19   fingertips.  You know, just tired, couldn't hardly

20   do anything.  Chest pains on and off.  Yeah, that's

21   it.

22       Q    And you told us that's kind of how you

23   feel today, with the exception of the tingling in

24   your finger tips; is that right?

                                              118

1       A    Pardon me?

2       Q    Do you still feel that way today with the

3    exception of the tingling in your fingertips?

4       A    Yeah, on and off.

5       MS. TROEMPER: All right. I'm going to pass

6    it back over to Mr. Vogt.

7       MR. VOGT: I just have a couple more,

8    Mr. Scott, and we'll get you out of here.

9                         EXAMINATION

10                        BY MR. VOGT:

11      Q    Since you have been transferred to

12   Western -- I mean to Logan, is your medical care

13   here okay? Any complaints?

14      A    Yeah, I have a complaint other than, you

15   know what I'm saying. Because see, I've been

16   having a couple chest pains last week but I didn't

17   go to health care, I -- when I went over there to

18   go pick up my medicines, I tell the nurse and they

19   keep telling me I got to fill out a money voucher

20   for this.

21           I'm like, I'm not going to keep filling

22   out no money vouchers for the same thing, the

23   problem. And I told her and according to the

24   Illinois compel statute, which is the law, that if

                                                    119

```
1      STATE OF ILLINOIS   )

2                          )  SS

3      COUNTY OF MENARD    )

4                   C E R T I F I C A T E

5            I, Tricia L. Gudgel, a Notary Public and

6      Certified Shorthand Reporter in and for said County

7      and State do hereby certify that the Deponent

8      herein, TONY SCOTT, prior to the taking of the

9      foregoing deposition, and on the 11th of April

10     A.D., 2007, was by me duly sworn to testify to the

11     truth, the whole truth and nothing but the truth in

12     the cause aforesaid; that the said deposition was

13     on that date taken down in shorthand by me and

14     afterwards transcribed, and that the attached

15     transcript contains a true and accurate translation

16     of my shorthand notes referred to.

17            Given under my hand and seal this 17th

18     day of April A.D., 2007.

19                  Tricia Gudgel

20                  Notary Public and

21                  Certified Shorthand Reporter

22     License No. 084-004053

23

24
```

OFFICIAL SEAL
TRICIA GUDGEL
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 11-3-2007

**E-FILED**
Monday, 09 July, 2007  03:20:35 PM
Clerk, U.S. District Court, ILCD

STATE OF ILLINOIS          )
                           )      *Scott v. Brown, et al.,*
                           )      USDC-CD Ill. No. 06-3144
COUNTY OF MORGAN           )

## AFFIDAVIT

I, Terry Polk, having first been duly sworn upon oath, state that I have personal

knowledge of the facts set forth herein, that I am competent to testify and if called to testify

would state as follows:

1. I am currently employed by the Illinois Department of Corrections ("Department") as

Warden of Jacksonville Correctional Center.

2. I previously served as Warden of Western Correctional Center from October 16,

2004 to December 15, 2005.  Western Correctional Center is a Level 2 medium security facility,

housing approximately 1920 adult felony offenders.  As Warden of Western Correctional

Center, I was responsible for the overall administration of the operations of the institution,

including the security of the facility and the delivery of programs and services to offenders

incarcerated at Western Correctional Center.

3. Because of the nature and volume of responsibilities I had while I was Warden at

Western Correctional Center, and the need to respond to institutional needs and emergencies

in an expeditious fashion, I did not routinely become involved in matters relating to the

diagnosis and treatment of illnesses or injuries sustained by offenders.  Furthermore, I have no

medical training.  Accordingly, I relied upon the staff of licensed health care personnel to

provide appropriate health care treatment under the supervision Dr. Lowell Brown.

4. I had no personal involvement in any diagnosis, treatment, or medical care that the

plaintiff, Tony Scott, #N92280, received while at Western Correctional Center.

5. I am not a physician, and am neither licensed nor trained to provide medical care.  I

cannot prescribe medication, nor can I second guess the medical decisions made by licensed

1

EXHIBIT
B

physicians.

6. I did receive one or more letters and/or grievances from Mr. Scott and/or his wife

Maryilyn Johnson regarding the medical treatment Mr. Scott was receiving at Western

Correctional Center. The attached memorandum is a true and accurate copy of a response I

provided to Mr. Scott.

I have read the foregoing paragraphs and they are true and correct to the

best of my knowledge and belief.

_____
Terry Polk

Subscribed and sworn to before me
this 24th day of May, 2007.


Notary Public

OFFICIAL SEAL
SHEILA R BROWN
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:11/09/10

2



**Illinois**
Department of
**Corrections**

Rod R. Blagojevich
Governor

Roger E. Walker Jr.
Director

Western Illinois Correctional Center  /  R. R. 4,  Box 196  /  Mt. Sterling, IL 62353  /  Telephone: (217) 773-4441  /  TDD:  (800) 526-0844

## M E M O R A N D U M

**DATE:**      June 16, 2005

**TO:**        Tony Scott N92280
               R-1 A-66

**FROM:**      Terry L. Polk
               Warden

**SUBJECT:**       **MEDICAL TREATMENT**

I have received a letter from Marilyn Johnson stating that you are indicating to her that you are not receiving proper medical treatment at this facility.  If you feel this is true, I recommend you follow the department's grievance procedure by filing a grievance, if you have not already started this process.

Terry L. Polk
Warden

TLP:tlr

cc:    Sue Redshaw – Grievance Officer
       File
       Chron File

**STATE OF ILLINOIS**    )
                       )    ***Scott v. Brown, et al.,***
                       )    **USDC-CD Ill. No. 06-3144**
**COUNTY OF BROWN**    )

## AFFIDAVIT

I, Roger Zimmerman, having first been duly sworn upon oath, state that I have personal knowledge of the facts set forth herein, that I am competent to testify and if called to testify would state as follows:

1. I am currently employed by the Illinois Department of Corrections ("Department") as Warden of Western Correctional Center. I have held this position since February 1, 2006. I have been employed by the Department in other capacities since January 20, 1987.

2. Western Correctional Center is a Level 2 medium security facility, housing approximately 2000 adult felony offenders. As Warden of Western Correctional Center, I am responsible for the overall administration of the operations of the institution, including the security of the facility and the delivery of programs and services to offenders incarcerated at Western Correctional Center.

3. Because of the nature and volume of responsibilities I have as Warden at Western Correctional Center, and the need to respond to institutional needs and emergencies in an expeditious fashion, I do not routinely become involved in matters relating to the diagnosis and treatment of illnesses or injuries sustained by offenders. Furthermore, I have no medical training. Accordingly, I rely upon the staff of licensed health care personnel to provide appropriate health care treatment under the supervision Dr. Lowell Brown.

4. I had no personal involvement in any diagnosis, treatment, or medical care that the plaintiff, Tony Scott, #N92280, received while at Western Correctional Center.

5. I am not a physician, and am neither licensed nor trained to provide medical care. I cannot prescribe medication, nor can I second guess the medical decisions made by licensed

1



EXHIBIT

C.

physicians.

I have read the foregoing paragraphs and they are true and correct to the best of my knowledge and belief.

Roger Zimmerman

Subscribed and sworn to before me this _7th_ day of ~~May~~, 2007.
June

Notary Public

"OFFICIAL SEAL"
JENNIFER S. SUHLING
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES APRIL 30, 2010

2

| STATE OF ILLINOIS | ) | |
|---|---|---|
| | ) | *Scott v. Brown, et al.,* |
| | ) | **USDC-CD Ill. No. 06-3144** |
| COUNTY OF BROWN | ) | |

## AFFIDAVIT

I, Karolyn Hendricks, having first been duly sworn upon oath, state that I have personal knowledge of the facts set forth herein, that I am competent to testify and if called to testify would state as follows:

1. I was formerly employed by the Illinois Department of Corrections as a Correctional Officer at Western Correctional Center, until my retirement in December 2005.

2. I am not a physician, and am neither licensed nor trained to make diagnoses or prescribe medication. I had no personal involvement in the medical care or treatment received by the Plaintiff, Tony Scott, #N92280, while he was incarcerated at Western Correctional Center.

3. I have no recollection of the Plaintiff, Tony Scott, #N92280, nor do I recall speaking to him about his nitro pills on August 10, 2005.

4. However, I can say that had I observed Mr. Scott to be having a medical emergency or in need of medical attention on August 10, 2005, I would have contacted a Lieutenant, Captain, or the Health Care Unit staff for assistance.

I have read the foregoing paragraphs and they are true and correct to the best of my knowledge and belief.

_Karolyn K Hendricks_
Karolyn Hendricks

Subscribed and sworn to before me
this 24th day of May, 2007.

_Jennifer S. Suhling_
Notary Public

```
..................................
:      "OFFICIAL SEAL"           :
:    JENNIFER S. SUHLING         :
:  NOTARY PUBLIC, STATE OF ILLINOIS :
:  MY COMMISSION EXPIRES APRIL 30, 2010 :
..................................
```

1

**EXHIBIT**

D

STATE OF ILLINOIS            )
                             )        *Scott v. Brown, et al.*
                             )        USDC-CD Ill. No. 06-3144
COUNTY OF LOGAN)

## AFFIDAVIT

I, Kathleen Nelson, having first been duly sworn upon oath, state that I have personal knowledge of the facts set forth herein, that I am competent to testify, and if called to testify would state as follows:

1.  I am currently employed as the Director of Nursing at Logan Correctional Center. I have held this position since April 1, 2000.

2.  I hereby affirm that the attached medical progress notes of Tony Scott, #N92280, are true and correct photocopies of documents created at or near the time of the events depicted therein, which are maintained in the ordinary course of business at Logan Correctional Center.

I have read the foregoing paragraphs and they are true and correct to the best of my knowledge and belief.

_____
Kathleen Nelson

Subscribed and sworn to before me
this 5th day of July, 2007.

_____
Notary Public

"OFFICIAL SEAL"
Susan J. McFarlin
Notary Public, State of Illinois
My Commission Exp. 09/13/2008

1

EXHIBIT

E

ILLINOIS DEPARTMENT OF CORRECTIONS

## Offender Outpatient Progress Notes

### Western Illinois Correctional Center

**Offender Information:**

Last Name: _Scott_    First Name: _Tony_    MI: ___    IDW#: _N92280_

| Date/Time | Subjective, Objective, Assessment | Plans |
|---|---|---|
| 8/4/05 3P | MD NOTE: the meds. I spoke ē Dr. Velolla (cardiol.) who stated that S.L. Nitro alone is indicated for angina, but not isosorbide. He also believes that clopidogrel is useful for 6-12 months after a procoagulant event, but aspirin alone thereafter is suitable. — J. Brown MD | noted C Thompson RN |

ILLINOIS DEPARTMENT OF CORRECTIONS

## Offender Outpatient Progress Notes

### Western Illinois Correctional Center

| Offender Information: | | | |
|---|---|---|---|
| Scott (Last Name) | Tony (First Name) | MI | ID#: N92280 |

| Date/Time | Subjective, Objective, Assessment | Plans |
|---|---|---|
| 8-17-05 9 AM | Medical Records Note: | |
| | Offender recieved copies of medical records per request. Authorization form and money voucher signed by offender. | Jennie SNZ |
| 8-22-05 11 A | MD SICK CALL WT 188# BP 28/85 T 97² P 76-76 | |
| | S — Concern over cardiac status. He feels that the security & nursing personnel are unprofessional & "playing ⊂ his life". He relies on NITRO. Smokes. Had stroke; has angina. | Restart plavix Nitro refill (#a) Will discuss transfer ⊂ Admin. See Me 2 w. ECHO |
| | | M Brown |

Printed on Recycled paper

DOC 0084 (Eff. 8/2002)
(Replaces DC 7147)

ILLINOIS DEPARTMENT OF CORRECTIONS

**Offender Outpatient Progress Notes**

**Western Illinois Correctional Center**

Offender Information:

Last Name: Scott    First Name: Tony    MI: _____    ID#: N93280

| Date/Time | Subjective, Objective, Assessment | Plans |
|---|---|---|
| 8/23/05 12:30pm ✗ | Radiology Note Mr Brown notified plan is non formulary med requiring non formulary form Chart to Mr Brown | ~ Brennan RT |
| 8/24/05 10:00m ✗ | Chart to Mr Brown. Non formulary request Premarin, requiring lab off OK plan and history per appraval order Mr | Mr Brennan RT. |
| 8/25/05 8:45am ✗ | Mr requesting documentation and new request for plan appraval on Mr Scott has not taken plan Since 1 month in March 05 Chart to Mr Brown | Mr Brennan RT |

Distribution: Offender's Medical Record

ILLINOIS DEPARTMENT OF CORRECTIONS

**Offender Outpatient Progress Notes**

**Western Illinois Correctional Center**

| Offender Information: | | | |
|---|---|---|---|
| _Britt_ | _Tony_ | | ID#: N9 2280 |
| Last Name | First Name | MI | |

| Date/Time | Subjective, Objective, Assessment | Plans |
|---|---|---|
| 8/25/05 12N ⊄ | MD Note the subject has taken plavix since '03 when the MI occurred. there is no benefit to restarting it at this juncture. J Brown MD res noted 8/25/05 - 1 pm a ley | |
| 9-2-05 9 AM | Medical Records Note: Offender recieved copy of medical records per request. Authorization form and money voucher signed by Offender. | Frank SMII |

DOC 0084 (Eff. 9/2002)
(Replaces DC 7147)

Printed on Recycled Paper

: 00038

STATE OF ILLINOIS )
)
COUNTY OF SANGAMON )

### AFFIDAVIT

I, MELODY J. FORD, being first duly sworn upon oath, state that I have personal knowledge of the facts set forth herein, that I am competent to testify and if called to testify would state as follows:

1. I am a Chairperson with the Office of Inmate Issues for the Illinois Department of Corrections ("the Department") and have held this position since August 1, 2001. I have been employed by the Department in various capacities since June 1993. As an Administrative Review Board ("ARB") Chairperson, my duties involve, among other things, review and respond to grievances filed by Department inmates in the manner set forth herein.

2. Inmates incarcerated within the Department may file grievances in accordance with Department Rule 504F: Grievance Procedures for Committed Persons. Generally, an inmate must first attempt to resolve grievances through his counselor. If the grieved issue remains unresolved after such informal efforts, or for example, involves a disciplinary proceeding, the inmate may submit a written grievance on a grievance form to the facility Grievance Officer designated by the Chief Administrative Officer ("CAO"). The Grievance Officer may personally interview the inmate and/or other witnesses as deemed appropriate and obtain relevant documents to determine the merits of the inmate's grievance. Upon completion of such investigation, the Grievance Officer's conclusions and if appropriate, recommended relief is forwarded to the CAO. The CAO, or CAO's designee's, decision is then submitted to the grieving inmate.



EXHIBIT

F

3. If, after receiving the CAO's decision the inmate feels the issue is unresolved, he may appeal in writing to the Director of the Department by submitting the Grievance Officer's report and CAO's decision. The ARB, as the Director's designee, reviews the appeal and first determines whether the inmate's grievance can be handled without the necessity of a hearing. If so, the inmate is so advised. Other matters are scheduled for an ARB hearing involving an interview of the grieving inmate, examining relevant documents and at the ARB's discretion, calling witnesses. The ARB submits a written report of its findings and recommendations to the Director or Director's designee who then reviews the report and makes a final determination on the grievance. A copy of the ARB's report and the Director's final decision is sent to the inmate who filed the grievance. The originals of these documents are maintained in the ARB's files. Department Rule 504F: Grievance Procedures for Committed Person provides no further means for review beyond this step.

4. Certain issues may be grievance directly to the ARB, rather than first through a counselor or grievance officer. These issues include:

   a. Decisions involving the involuntary administration of psychotropic medication;

   b. Decisions regarding protective custody placement, including continued placement in or release from protective custody;

   c. Decisions regarding disciplinary proceedings which were made at a facility other than the facility where the inmate is currently assigned; and

   d. Other issues except personal property issues which pertain to a facility other than the facility where the inmate is currently assigned.

These grievances are then handled in accordance with the procedures described in paragraph 3 above.

5. An inmate may request a grievance be handled on an emergency basis by forwarding the grievance directly to the CAO rather than to a counselor or grievance officer. If the CAO

determines that there is a substantial risk of imminent personal injury or other serious or irreparable harm to the inmate, the grievance may be handled on an emergency basis. An inmate may appeal the CAO's decision in such a situation to the ARB. The appeal is then handled in accordance with the procedure described in paragraph 3 above.

6. The grievance procedure may not be utilized for complaints regarding decisions which are outside the Department's authority such as parole decisions, clemency or orders regarding the length of sentences or decisions which have been reviewed by the Director.

7. At the request of the Attorney General's Office, I have searched the ARB's records in regard to Tony Scott, Register Number N92280. ARB records indicate he has not exhausted his administrative remedies regarding staff conduct of Correctional Officer Karolyn Hendricks on August 10, 2005 at Western Illinois Correctional Center.

I have read the foregoing and affirm that the facts contained herein are true and correct to the best of my knowledge and belief.

**FURTHER AFFIANT SAYETH NOT.**

_____
Melody J. Ford

SUBSCRIBED AND SWORN TO
before me on the date of June 27, 2007.

_____
NOTARY PUBLIC

OFFICIAL SEAL
SARA M. MCDANIEL
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 7-23-2008

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

TONY SCOTT, #N92280,    )
    )
    Plaintiff,    )
    )
  - vs-    )    No. 06-3144
    )
DR. LOWELL BROWN, et al.,    )
    )
    Defendants.    )

## RESPONSE TO PLAINTIFF'S INTERROGATORIES

NOW COME the defendants, DEBORAH FUQUA, CAROLYN HENDRICKS, TERRY POLK, ROGER WALKER, JR., and ROGER ZIMMERMAN, by and through their attorney, Lisa Madigan, Attorney General for the State of Illinois, to respond to Plaintiff's Interrogatories as follows:

1.    State the duties of Defendant Fuqua Medical Administrator at Western Correctional Facility (Western). If those duties are set forth in any job description or other document, produce the document.

**Response:  See the attached position descriptions for a Senior Public Service Administrator (Health Care Unit Administrator), effective 11/01/06.**

2.    State the duties of Defendant Warden Zimmerman, Chief Administration at Western in so far as they pertain to providing medical care to prisoners or transportation of prisoners to medical appointments or facilities. If those duties are set forth in any job description or other document, produce the document.

1



EXHIBIT

G



**Illinois Department of**
**CENTRAL MANAGEMENT SERVICES**

POSITION DESCRIPTION

| 1. POSITION TITLE | WORKING TITLE (IF ANY) | Stangad Code | Pesition Title Option Code | 2. POSITION NUMBER | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Existing Position | | | | | | | | | |
| New/Revised Position<br>Sr. Public Service Administrator | Health Care Unit Administrator | | 8N | 40070-29-99-210-00-01 | | | | | |
| 3. AGENCY | 4. BUREAU/ DIVISION | | | 5. EXMT CODE | 6. WORK COUNTY | 7. AA AUTH. | 8.AUDIT | 8. OFFICE USE | |
| Existing Position | | | | | | | | | |
| New/Revised Position<br>Corrections | Western Illinois Correctional Center | | | 5 | 005 | N | R | | |
| 10. SECTION | 11. UNIT | | | 12. TRANSACTION CODE | | | 13. EFFECTIVE DATE | | |
| Existing Position | | | | | | | | | |
| New/Revised Position<br>Programs | Health Care Unit | | | | | | 11/1/06 | | |

| 14. WORK LOCATION | 15. BARGAINING/TERM CODE | Rutan Exempt | ☐ MA021 ESTABLISH<br>☐ MC022 EXEMPT CODE CHANGE<br>☐ MC024 POSITION NUMBER CHANGE<br>☒ MC026 CLARIFY<br>☐ MC027 ADDITIONAL IDENTICAL CHANGE<br>☐ MC028 WORK COUNTY CHANGE<br>☐ MD021 ABOLISH<br>☐ MC149 DOWNWARD REALLOCATION<br>☐ MC150 LATERAL REALLOCATION<br>☐ MC158 UPWARD REALLOCATION |
|---|---|---|---|
| Existing Position | | | |
| New/Revised Position<br>Brown County | TA000 | N | |

| % OF TIME | 16. COMPLETE, CURRENT AND ACCURATE STATEMENT OF POSITION ESSENTIAL FUNCTIONS |
|---|---|
| | Under administrative direction of the Assistant Warden of Programs (SPSA), plans and coordinates the Health Care Unit exercising twenty-four hour responsibility for monitoring activities of the various health services areas; coordinates and implements policies and procedures; Inspects the heath care unit for proper sanitation; supervises contractual staff and clerical support. |
| 25% | 1. Supervises staff; assigns work; approves time off; provides guidance and training; gives oral reprimands; effectively recommends grievance resolutions; completes and signs performance evaluations; establishes annual goals and objectives; counsels staff on problems with productivity, quality of work and conduct; determines staffing needs to achieve program objectives; reviews activity reports; monitors provisions of contractual agreements; certifies all provisions are adhered to; recommends termination or renewal of contract. |
| 20% | 2. Manages and directs the daily operations of the Health Care Unit on a twenty-four (24) hour basis providing treatment and services to include out-patient, in-patient and pharmaceutical delivery; organizes and coordinates patient care assignments, monitors staff functions to ensure that patient care and services comply with medical, professional, departmental and facility policies and procedures; confers with Assistant Warden of Programs as to matters of institutional medical and treatment policies; remains up-to-date and in compliance with American Correctional Association, Administrative and Institutional Directives. |
| 15% | 3. Develops and implements polices, rules and procedures for the establishment and maintenance of the delivery of sound treatment and quality medical services consistent with institutional policies, Administrative Directives and Departmental Rules. |
| 10% | 4. Maintains statistical reports of expenses for health services; coordinates and processes requisitions for drug testing kits and the acquisition and replacement of all therapeutic equipment, materials, supplies and pharmaceuticals for an efficient operation of the Health Care Unit; directs the maintenance of property control of all supplies and equipment in the Health Care Unit. |
| 10% | 5. Conducts monthly inspections in regards to health sanitary and safety conditions; provides monthly, quarterly and annual reports to Assistant Warden of Programs; performs unscheduled inspections of the health care unit, monitoring to ensure that health care unit environment is conductive for |

| DIRECTOR OF CMS SIGNATURE | IMMEDIATE SUPERVISOR SIGNATURE | AGENCY HEAD SIGNATURE | DATE |
|---|---|---|---|
| | | *Roger E. Walker Jr.* | 12/4/06 |

CMS-104 (Rev. 10/94) IL 401 0794

| 16. (CONTINUED) |
|---|
| % OF TIME |

effective treatment; monitors drug and supply organization; coordinates activities of health care services to inmates and acts as liaison between activities, health care personnel and administration.

05%   6.  Conducts regularly scheduled staff meetings; consults with staff monitoring to ensure personal and educational development of occupational skills of staff are updated to improve performance and meet standards of care.

05%   7.  Develops and implements with security on transportation of offenders for outside appointments; works with security staff to promote and maintain appropriate security over offender movement in and out of the Health Care Unit.

05%   8.  Monitors and directs the acceptance and maintenance of all medical records to ensure the safekeeping through development and implementation of file security.

05%   9.  Performs other duties as required or assigned which are reasonably within the scope of the duties enumerated above.

17. POSITION TITLE AND NUMBER OF IMMEDIATE SUPERVISOR (Responsible for assigning and reviewing work, preparing, conducting and signing performance evaluations; effectively recommending and imposing disciplinary action and adjusting grievances for the incumbent of this position.)

Sr. Public Service Admin.   40070-29-99-200-00-01

WORKING TITLE (IF ANY)
A/W of Programs

18. CHECK THE APPROPRIATE BOX IF THIS POSITION IS A:

☒ SUPERVISOR   OR   ☐ LEAD WORKER

NOTE: Supervisory or lead worker responsibilities **must** be described in a detailed duty statement(s) with a time percentage(s) allotted.

If a box was checked above, list position title, position number, and number of subordinate incumbents or authorized funded headcount:

| Position Title | Position Number | No. of Incumbent or Funded Vacancies |
|---|---|---|
| Office Associate | 30015-29-99-210-05-01 | 1 |
| Contractual Health Care Unit | | |
| Subordinate Nursing Supervisor | | |
| Contractual Nursing Staff | | 2 |
| Health Care Professionals | | 2 |
| | | 2 |
| | | |
| | | |

19. SPECIALIZED KNOWLEDGES, SKILLS, ABILITIES, LICENSURE OR CERTIFICATION NECESSARY FOR THE SUCCESSFUL PERFORMANCE OF THE WORK OF THIS POSITION. NOTE: SINCE THERE ARE NOW SEVERAL OPTIONS OF SKILLS AND ABILITIES AND LICENSURE OR CERTIFICATION IDENTIFIED ON STANDARDS, THE PHRASE "SAME AS SPECIFICATION" CAN NO LONGER BE USED.
Requires licensure as a Registered Nurse in the State of Illinois; requires a Bachelor's Degree in Nursing and four years of professional nursing experience preferably including three years of supervisory experience; requires thorough knowledge of professional nursing theory and practice and of recent developments in the field of nursing; requires ability to develop staffing plans and to revise such plans to meet emergency requirements; requires ability to interpret, implement, and enforce policies, procedures and practices in the area of patient care; requires ability to develop and maintain harmonious working relationships with subordinate staff and to provide constructive criticism and counseling to alleviate work related problems.

STATE OF ILLINOIS         )                    *Tony Scott v. Dr. Lowell Brown, et al.*
                          ) ss               USDC-CD Ill. No. 06-3144
COUNTY OF MORGAN          )

## ATTESTATION

I, Terry Polk, being first duly sworn on oath, depose and state that I have read

the foregoing document, and the answers made herein are true, correct and complete

to the best of my knowledge and belief.

_____
                                            Terry Polk

SUBSCRIBED and SWORN to before me
this 16th day of April, 2007.

_____
        Notary Public

OFFICIAL SEAL
SHEILA R BROWN
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:11/09/10